# EXHIBIT A

BRYAN CAVE LLP
1290 Avenue of the Americas
New York, New York  10104
(212) 541-2000
Robert A. Wolf (RW 3419)
Andrea K. Fisher (AF 0150)
Counsel to Robert L. Geltzer, the Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | **Chapter 7** |
| 1ST ROCHDALE COOPERATIVE GROUP, LTD. | **Case Nos. 05-12086 (PCB)** |
| Debtor. | |

- - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ROBERT L. GELTZER, as Chapter 7 Trustee for 1ST ROCHDALE COOPERATIVE GROUP, LTD., | |
| Plaintiff, | |
| v. | **Adversary Proceeding No.** |
| GARY ALTMAN, RHODA BROWN, "JOHN DOE 1" AS EXECUTOR OR ADMINISTRATOR OF THE ESTATE OF GEORGE CRETHAN, SAUL MILDWORM, JACK RASKIN, DAVID SMITH, "JOHN DOE 2" AS EXECUTOR OR ADMINISTRATOR OF THE ESTATE OF ALLEN THURGOOD, EDWARD YAKER, GREGORY WORTHAM and DAVID L. JOHNSON, | **COMPLAINT** |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - x

Robert L. Geltzer, as Chapter 7 Trustee (the "Trustee"), of 1st Rochdale Cooperative Group, Ltd. ("1st Rochdale" or the "Debtor"), by his counsel Bryan Cave LLP, as and for his Complaint, alleges as follows against the above-captioned defendants (collectively, "Defendants"), based upon information and belief (gained from, among other things, an examination conducted pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and available internal corporate documents and records of the Debtor and other publicly available documents):

## NATURE OF THE ACTION

1.      By the instant adversary proceeding, the Trustee seeks:

(a)      to recover damages suffered by the Debtor as a result of numerous breaches of fiduciary duties to the Debtor by the Debtor's former directors and senior officers;

(b)      to recover certain fraudulent conveyances made to certain officers of the Debtor; and

(c)      to obtain related relief.

## THE PARTIES

2.      The Trustee is a resident of the State of New York and is a licensed attorney maintaining an office at 1556 Third Avenue, Suite 505, New York, New York 10128.

3.      Upon information and belief, at all relevant times, the Debtor, 1st Rochdale Cooperative Group, Ltd., was a New York corporation with a principal place of business located at 465 Grand Street, New York, New York 10002.

4.      Upon information and belief, at all relevant times, Defendant Gary Altman ("Altman") was and is an individual residing at 572 Grand Street, New York, New York 10002, and was a member of the Board of Directors of 1st Rochdale and served on 1st Rochdale's Legal Committee.

5.      Upon information and belief, at all relevant times, Defendant Rhoda Brown ("Brown") was and is an individual residing at 444 Neptune Avenue, Apt. 3B, Brooklyn, New York 11224, and was a member of the Board of Directors of 1st Rochdale and was a member of 1st Rochdale's Executive Committee.

6.      Upon information and belief, at all relevant times, George Crethan ("Crethan") was an individual residing at 21-25 34th Avenue #15D, Long Island City, New York 11106, and

C0460380189460/1376610.4

was a member of the Board of Directors of 1st Rochdale and was a member of 1st Rochdale's Executive Committee.

7.  Upon information and belief, Crethan died in or about March 2006.

8.  Upon information and belief, Crethan's estate is administered by Defendant "John Doe 1" as Executor or Administrator of the Estate of George Crethan (the "Crethan Estate"). The identity of "John Doe 1" is not known at the present time. The Trustee reserves the right to amend the caption of the adversary proceeding to substitute the name of "John Doe 1" upon ascertaining his/her identity.

9.  Upon information and belief, at all relevant times, Defendant Saul Mildworm ("Mildworm") was and is an individual residing at 473 FDR Drive, K1805, New York, New York 10002, and was a member of the Board of Directors and an officer of 1st Rochdale and served as President of 1st Rochdale and was a member of 1st Rochdale's Executive Committee and Legal Committee.

10.  Upon information and belief, at all relevant times, Defendant Jack Raskin ("Raskin") was and is an individual residing at 305 West 28th Street, Apt. 9H, New York, New York 10001, and was a member of the Board of Directors and an officer of 1st Rochdale and served as Secretary of 1st Rochdale and was a member of 1st Rochdale's Executive Committee and Nominating Committee.

11.  Upon information and belief, at all relevant times, Defendant David Smith ("Smith") was and is an individual residing at 355 8th Avenue, Apt. 21F, New York, New York 10001, and was a member of the Board of Directors of 1st Rochdale.

12.  Upon information and belief, at all relevant times, Allen Thurgood ("Thurgood") was an individual residing at 114 West 70th, #3B, New York, New York 10023, and was a member of the Board of Directors and an officer of 1st Rochdale and served as Chairman, Vice

(3)

President and Chief Executive Officer of 1st Rochdale and was the Chairman of 1st Rochdale's Executive Committee.

13.     Upon information and belief, Thurgood died in or about October 2005.

14.     Upon information and belief, Thurgood's estate is administered by Defendant "John Doe 2" as Executor and Administrator of the Estate of Allen Thurgood (the "Thurgood Estate"). The identity of "John Doe 2" is not known at the present time.  The Trustee reserves the right to amend the caption of the adversary proceeding to substitute the name of "John Doe 2" upon ascertaining his/her identity.

15.     Upon information and belief, at all relevant times, Defendant Edward Yaker ("Yaker") was and is an individual residing at 3980 Orloff Avenue, Apt. 11-C, Bronx, New York 10463, and was a member of the Board of Directors and an officer of 1st Rochdale and served as Treasurer of 1st Rochdale was a member of 1st Rochdale's Executive Committee and Structure and Governance and Finance and Audit Committees.

16.     Upon information and belief, Defendant Gregory L. Wortham ("Wortham") is an individual residing at 311 E. Avenue C, Sweetwater, Texas 79556, and, at all relevant times, was an officer of 1st Rochdale and served as Vice President and Chief Operating Officer/Assistant Secretary of 1st Rochdale.

17.     Upon information and belief, at all relevant times, Defendant David L. Johnson ("Johnson")  was  and  is  an  individual  residing  at  2  Highview  Avenue Bernardsville, New Jersey 07924, was an officer of 1st Rochdale and served as Chief Financial Officer/Assistant Secretary of 1st Rochdale.

## JURISDICTION AND VENUE

18.     The United States District Court for the Southern District of New York has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334.  By virtue of 28 U.S.C.

(4)

§ 157(a), and the Order dated July 10, 1984 of District Court Judge Robert J. Ward of the United States District Court for the Southern District of New York, this adversary proceeding is automatically referred to the United States Bankruptcy Court for the Southern District of New York.

19.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (H).

20.    In the event that any part of the claims contained herein is found to be "non-core", the Trustee consents to the entry of final orders and judgments by the Bankruptcy Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

21.    The predicates for the relief sought herein are §§ 544 and 550 of the Bankruptcy Code and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law and the common law of the State of New York.

22.    Venue of the subject Chapter 7 case and of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

### Background

23.    Upon information and belief, at all relevant times, the Debtor's liabilities exceeded its assets.

24.    Upon information and belief, at all relevant times, the Debtor was unable to pay its obligations as they became due.

25.    Upon information and belief, at all relevant times, the Debtor was grossly undercapitalized for the business in which it was engaged.

26.    Upon information and belief, at all relevant times, the Defendants were fully aware of the Debtor's poor financial condition.

C046038018946O/1376610.4

27.    On March 31, 2005 (the "Petition Date"), the Debtor filed a voluntary Chapter 7 petition (the "Petition") under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.

28.    On March 31, 2005, the Trustee was appointed Interim Trustee of the Debtor. He subsequently became permanent Trustee by operation of law, and now is qualified and acting as Trustee.

**The Formation of the Debtor's Business**

29.    Upon information and belief, the Debtor was formed as a general cooperative corporation on or about August 27, 1997, under the laws of the State of New York, including the Cooperative Corporations Law of the State of New York.

30.    Upon information and belief, at the time of its incorporation, Mildworm, Raskin, Smith, Thurgood and Yaker were elected to 1st Rochdale's Board of Directors.

31.    Upon information and belief, Altman, Brown and Crethan were elected to 1st Rochdale's Board of Directors on or about June 6, 1998 (Mildworm, Raskin, Smith, Thurgood, Yaker, Altman, Brown and Crethan will collectively be referred to as the "BOD").

32.    Based upon its certificate of incorporation, 1st Rochdale was authorized to do the following:

i.    Purchase or otherwise acquire or accumulate electrical power, heating oil, natural gas, propane or any other fuel or energy source and/or fuel or energy service (collectively "Energy Services") in order to meet the energy needs of cooperative housing companies and condominiums and/or other entities or persons (collectively "Consumers"), resell at the lowest feasible cost, or otherwise dispose of, any and all such Energy Services to Consumers, and/or arrange for the provision, transmissions, distribution or furnishing, of any and all such Energy

(6)

Services to consumers by third party providers or otherwise and/or provide any and all incidental services to Consumers to reduces Consumers' energy costs;

ii.     purchase or otherwise acquire for Consumers, and resell at the lowest feasible cost, or otherwise dispose of, to Consumers and/or arrange for the provisions, transmission, distribution or furnishing, directly or indirectly, to Consumers, phone, cable, satellite broadcast, internet, home security and/or medical alert services and/or any and all other similar communications services of any kind now known or hereafter devised; and

iii.     conduct any and all activities as shall from time be found appropriate to the foregoing, and which shall be lawful for Cooperative Corporations within the meaning of the Cooperative Corporation Law of the State of New York, including soliciting and receiving grants, bequests and contribution.

33.     Upon information and belief, at some point after its formation, 1st Rochdale formed seven (7) wholly owned subsidiaries, namely Twin Pines Fuels, LLC ("TPF LLC"), Twin Pines Fuels Corp. ("Twin Pines")[1], Gotham Power Development, LLC ("GPD"), Gotham Power Corporation, Gotham Power Company LLC, Gotham Power Zerega, LLC and Apple Juice Power, LLC.[2]

34.     Upon information and belief, Twin Pines and TPF LLC were formed in 1999.

35.     Upon information and belief, TPF LLC was formed primarily to participate in the fuel oil distribution business.

---

[1]     Twin Pines has itself been a debtor in bankruptcy since March 31, 2005, in a Chapter 7 case pending in the Bankruptcy Court of this District under the case caption, In re Twin Pines Fuel, Corp., Case No. 05-12088(PCB).  The Trustee is also the Trustee of Twin Pines.

[2]     Upon information and belief, other than Twin Pines, none of the other subsidiaries of 1st Rochdale have filed for bankruptcy.

C0460380189460/1376610.4

36.    Upon information and belief, Twin Pines was formed primarily to own real property located at 1066 Zerega Avenue, Bronx, New York (the "Zerega Avenue Property").[3]

37.    Upon information and belief, GPD, Gotham Power Corporation, Gotham Power Company LLC, Gotham Power Zerega, LLC and Apple Juice Power, LLC were formed primarily to develop power plants.

38.    Upon Information and belief, Thurgood was the Chairman and Chief Executive Officer of 1st Rochdale from the day of its formation.

39.    Upon information and belief, in 1998, Wortham joined 1st Rochdale and became its Vice President and Chief Operating Officer.

**Financing from National Cooperative Service Corporation**

40.    Upon information and belief, prior to his joining 1st Rochdale, Wortham was instrumental in arranging a series of loans from the National Cooperative Service Corporation ("NCSC") to 1st Rochdale.

41.    Upon information and belief, NCSC was and still is a privately funded, member-owned cooperative that provides electric cooperatives with specialized financing services. In addition, NCSC provides a range of specialized flexible financing services for members seeking new opportunities to serve their customers and potential customers.

42.    Upon information and belief, from the beginning of 1999, NCSC had provided credit support to 1st Rochdale in several ways such as by direct loan or letters of credit to the New York Independent System Operator ("NYISO") for the benefit of 1st Rochdale.

43.    Upon information and belief, NCSC and TPF LLC entered into a certain Loan Agreement, dated as of December 28, 1999, under which TPF LLC executed and delivered to

---

[3]    A sale of the Zerega Avenue Property is scheduled in the Twin Pines bankruptcy for April 26, 2007.

NCSC certain Promissory Notes, each dated as of December 28, 1999, in the original principal amounts of $2,400,000 and $2,600,000, a Revolving Line of Credit Agreement, dated as of December 28, 1999, in a total amount not to exceed $5,000,000, and a Revolving Line of Credit Agreement, dated as of July 18, 2000, in an amount not to exceed $4,000,000 (the "TPF LLC Loans").

44.    Upon information and belief, NCSC and 1st Rochdale entered into a Revolving Line of Credit Agreement, dated as of April 14, 1999, in an amount not to exceed $5,000,000. (the 1st Rochdale Loan").

45.    Upon information and belief, NCSC and 1st Rochdale entered into a certain Letter of Credit Application and Agreement, dated as of April 27, 2000, in a total amount not to exceed $9,000,000 (the "1[st] Rochdale Letter of Credit") (the 1st Rochdale Loan and the 1st Rochdale Letter of Credit will collectively be referred to as the "1st Rochdale Indebtedness").

46.    Upon information and belief, the TPF LLC Loans and the 1st Rochdale Indebtedness were both cross-guaranteed and cross-collateralized in favor of NCSC by 1st Rochdale, TPF LLC and Twin Pines.

47.    Upon information and belief, at some point in 2000, NCSC stopped extending new credit to 1st Rochdale and its subsidiaries.

48.    Upon information and belief, during the period following the time that NCSC stopped extending credit, 1st Rochdale requested new lines of credit from NCSC on several occasions, under different formats and plans, but it appears that every request was denied.

49.    Upon information and belief, on or about October 1, 2001, NCSC withdrew its credit support to NYISO and on October 10, 2001, NYISO issued a notice of termination of service agreement to 1st Rochdale.

50. Upon information and belief, 1st Rochdale attempted to get its credit support renewed with NCSC, but NCSC declined to renew its credit support to 1st Rochdale. 1st Rochdale was therefore no longer allowed to purchase energy directly from NYISO.

## 1st Rochdale's Business Development

51. Upon information and belief, in early 1998, 1st Rochdale obtained a certificate to operate as an Energy Service Company ("ESCO") and started the retail sale of power.

52. Upon information and belief, 1st Rochdale's initial customers were the cooperative societies that formed 1st Rochdale; however over the period of time 1st Rochdale managed to attract other individual and corporate customers including American Express.

53. Upon information and belief, along with its wholly-owned subsidiaries, 1st Rochdale developed the following four broad categories of business.

### i. Fuel Oil Distribution Business

54. Upon information and belief, in or about November 10, 1999, Twin Pines, with financing provided by NCSC to TPF LLC, purchased property at Zerega Avenue in Bronx, New York for $2.6 million, which property would be utilized for TPF LLC's fuel purchase, sale and storage operation.

55. Upon information and belief, although NCSC loaned in total approximately $14 million to TPF LLC, of which $5 million was to be utilized for the purchase and upgrade of the Zerega Avenue Property, very little money was actually spent on its upgrade.

56. Upon information and belief, approximately $9 million of the $14 million loaned to TPF LLC was to be utilized for the operation of the fuel oil business.

57. Upon information and belief, TPF LLC started purchasing and selling fuel oil in early 2000.

58.    Upon information and belief, TPF LLC continued this operation through the end of 2002, when, it was forced to close its fuel business by NCSC.

59.    Upon information and belief, during the period TPF LLC was in operation, its major clients included large cooperatives and government contracts where the margins were low.

60.    Upon information and belief, during the period of three years that TPF LLC was in operation, its aggregated losses amounted to over $7.7 million.

61.    Upon information and belief, one of the reasons that contributed to TPF LLC's low margin was a lack of sufficient funds to buy oil at a cheaper price.

62.    Upon information and belief, approximately $11.4 million of the original $14 million loaned to TPF LLC was available for the operation of TPF LLC fuel oil distribution business.

63.    Upon information and belief, approximately $3 million was diverted from TPF LLC to 1st Rochdale for the proposed power plant project as more fully set forth below.

64.    Upon information and belief, this diversion of funds from TPF LLC severely hurt the fuel oil business and left TPF LLC short of cash and unable to buy fuel oil at the cheapest price available. [4]

65.    Moreover, upon information and belief, notwithstanding the aforementioned diversion of funds from TPF LLC to 1st Rochdale, TPF LLC still had to pay interest on the full amount of the TPF LLC Loans to NCSC, further causing damage to the company.

---

[4]    Upon information and belief, a majority of the TPF LLC contracts consisted of government and semi government agencies, which had very low margins but had very high volume. In order to provide for these contracts TPF LLC had to invest significant amounts of money in inventory. TPF LLC also had to provide bonds to various institutions and invest in oil futures. Additionally, TPF LLC had to invest money in software development. The funds available to TPF LLC were insufficient for TPF LLC to penetrate the market and operate the business profitably.

C046038019460/1376610.4

66.    Upon information and belief, after NCSC allegedly forced TPF LLC to close down its business, NCSC apparently wanted Twin Pines and TPF LLC to sell the Zerega Avenue Property and repay the proceeds to NCSC.

67.    Upon information and belief, the management of Twin Pines and TPF LLC chose not to comply with NCSC's request to sell the Zerega Avenue Property, as management of 1st Rochdale wanted to build a power plant on that property.

68.    Upon information and belief, during the two years period following the shut down of the fuel oil business, TPF LLC incurred additional losses of over $2 million including: interest of $1.27 million, depreciation of $250,000, salaries, insurance, legal expenses, taxes and other expenses to maintain the Zerega Avenue property.

69.    Upon information and belief, these loss figures do not include the related management expenses incurred and paid through 1st Rochdale.

**ii.    Power Plant Development**

70.    Upon information and belief, in 1997 1st Rochdale began actively evaluating power plant development options in New York City.

71.    Upon information and belief, 1st Rochdale initially planned to buy power plants from Consolidated Edison ("ConEd") with significant input from NCSC.

72.    Upon information and belief, in 2000, 1st Rochdale and GPD embarked upon an ambitious plan to build a power plant at the Zerega Avenue Property. The plan to build the power plant changed dramatically over the years with the change in size of the proposed plant from a 79 megawatt ("MW") unit to a 260 MW unit and back to a 79 MW unit and type of the plant from a peaking plant to a simple cycle plant to a combined cycle plant.

(12)

73.    Upon information and belief, with every change in plan 1st Rochdale had to amend the layout, turbines and other plant components and seek fresh approvals from various authorities and incur the corresponding costs.

74.    Upon information and belief, during the time 1st Rochdale and GPD were planning to build the plant they were also planning to build and purchase other plants at different locations, including buying the North First Street (Brooklyn) property from ConEd and a plant at Coop City in Bronx, and purchasing power plants from the New York Power Authority.

75.    Upon information and belief, during the year 2000 and 2001, management consisting of the BOD namely, Altman, Brown, Crethan, Mildworm, Raskin, Smith, Thurgood and Yaker and the Chief Officers of 1st Rochdale namely, Thurgood, Wortham and Johnson (each of members of the BOD and each of the Chief Officers collectively will be referred to as "Management") spent millions of dollars in legal fees and consultants fees in order to obtain necessary permits and licenses.

76.    Upon information and belief, most of these monies were spent by 1st Rochdale and GPD even after NCSC had stopped extending further loans to 1st Rochdale and its subsidiaries.

77.    Moreover, and upon information and belief, 1st Rochdale did not have any other internal or external source of financing or joint venture agreement with an investor willing to provide the capital necessary in order to build a power plant.

78.    Upon information and belief, the money spent by 1st Rochdale and GPD for the development of a power plant was originally loaned to TPF LLC in order to provide for the retail sale of power and to TPF LLC for its fuel oil business.

(13)

79.     Upon information and belief, from the beginning of 2001, 1st Rochdale and GPD tried to attract various companies to invest in the power plant and to sign a joint venture agreement.

80.     Upon information and belief, in June and July 2001, 1st Rochdale negotiated with Sempra Energy Solutions Corporation ("Sempra") for possible investment in the power plant. Sempra wanted to build a 79.9 MW simple cycle power plant at Zerega Avenue which plans were later converted into a 79.9 MW combined cycle power plant.

81.     Upon information and belief, based on discussions with Sempra, along with several other provisions, 1st Rochdale would invest $3 million as capital and Sempra would pay 1st Rochdale $6.75 million in cash in five installments upon achieving various milestones for power plant development.

82.     Upon information and belief, 1st Rochdale would additionally receive approximately $5 million in cash within five years of commercial operation of the power plant as additional investment from Sempra.

83.     Upon information and belief, Sempra was to fund all the construction costs of the project. Upon execution of the contract Sempra would have acquired a 95% interest in the power plant leaving the remaining 5% with 1st Rochdale.

84.     Upon information and belief, the deal between 1st Rochdale and Sempra broke off in August or September 2001. [5]

85.     Upon information and belief, all of this occurred while according to the books and records, 1st Rochdale had insufficient monies to meet its then current obligations.

---

[5]     Upon information and belief, at the same time 1st Rochdale, lacking funds necessary to go through with the Zerega Avenue Property power plant construction as no agreement was signed with Sempra, placed a $9.4 million bid to buy the North First Street, Brooklyn property from ConEd. However, as ConEd was looking for a higher sale price, the deal did not materialize.

(14)

86.    Upon information and belief, although documents reviewed suggest that 1st Rochdale made various plans and expected to build the plant and to commence the operation within one year, a March 28, 2003 report stated that it could take up to 44 months solely to obtain environmental permits.

87.    Upon information and belief, during the year 2003, well after NCSC had ceased extending financing and credit arrangements to 1st Rochdale, 1st Rochdale started concentrating on building a power plant with the expectation that it might qualify for Liberty Bond financing.

88.    Upon information and belief, 1st Rochdale incurred significant sums in a failed attempt to lobby politicians in Washington, DC, to insure that the power plant planned by 1st Rochdale, although located in Bronx, would qualify for the financing under the Liberty Zone Bonds proposed by the federal government pursuant to the New York City economic recovery incentives for the downtown Manhattan (Liberty Zone) area.

89.    Upon information and belief, 1st Rochdale failed to obtain the Liberty Zone Bonds.

90.    Upon information and belief, based on a review of reports prepared for 1st Rochdale, it would cost approximately $1.2 million to $1.4 million per MW to build a combined cycle power plant. Therefore the total costs of a 79.9 MW combined cycle power plant proposed by 1st Rochdale would have exceeded $100 million.

91.    Upon information and belief, 1st Rochdale lacked both the funds and the financing necessary to pay for any part of this proposed power plant and its only potential contribution to the building of a power plant was the Zerega Avenue Property.

92.    Upon information and belief, in early 2004, 1st Rochdale sent out offer letters to various potential parties who might be interested in building a power plant at Zerega Avenue Property.

93.    Upon information and belief, in response to those letters, Allied Investors Consortium, LLC ("Allied Investors") negotiated and entered into an agreement with 1st Rochdale.

94.    Upon information and belief, based on the agreement, Allied Investors would invest over $10 million for a 50% ownership interest.

95.    Upon information and belief, Allied Investors would also pay 1st Rochdale in excess of $1,000,000 in six stages upon completion of specified terms.

96.    Upon information and belief, 1st Rochdale's contribution to the project was to be the Zerega Avenue Property and the related developmental work with a combined investment valued at $7.2 million for its 50% share.

97.    Upon information and belief, the balance of the funds to construct the power plant were supposed to be raised through financing.

98.    Upon information and belief, Allied Investors decided not to pursue the construction of the plant.

99.    Upon information and belief, it appears that from this date through the petition date, 1st Rochdale did not attempt to resurrect these or any other plans for constructing a power plant.

### iii.    Sustainable Energy

100.    Upon information and belief, the sustainable energy initiative by 1st Rochdale and its subsidiaries consisted of energy management services, on-site power generation through solar energy, fuel cells, micro turbine and appliance fairs where members and consumers would be able to acquire household appliances at discounted prices.

101.    Upon information and belief, 1st Rochdale provided energy management services to its members for a fee with the objective of lowering total energy costs to them and their customers.

102.    Upon information and belief, the on-site power generation services included installing solar energy, fuel cell and micro turbines for a fee and related services.

103.    Upon information and belief, it appears that the financing of the on-site power generation projects were on a 50-50 basis whereby 50% of the cost of the projects was provided by New York State Energy Research and Development Authority ("NYSERDA") in the form of a rebate to the customers and the remaining 50% was paid by the customer.

104.    Upon information and belief, 1st Rochdale received a nominal fee for coordinating these activities.

105.    Upon information and belief, the fee received by 1st Rochdale for these projects was insufficient to cover the associated overhead expenses.

106.    Upon information and belief, Management was aware of these losses; however in furtherance of their breach of fiduciary duty to 1st Rochdale, they chose to ignore the situation, and thus caused 1st Rochdale to incur further losses in connection with these projects.

**The ESCO Business**

107.    Upon information and belief, on October 22, 2001, 1st Rochdale signed an agreement to purchase energy from Mirant Americas Energy Marketing LP ("Mirant"), which 1st Rochdale would then resell to its customers.

108.    Upon information and belief, as a result of this agreement between 1st Rochdale and Mirant, 1st Rochdale and NCSC agreed to grant Mirant a security interest in all of 1st Rochdale's energy payments and receivables from its customers.

(17)

109.    Upon information and belief, this arrangement with Mirant helped 1st Rochdale to retain its status as an ESCO and continue to operate its retail sale of power business.

110.    Upon information and belief, in July 2003, Mirant filed for bankruptcy and on July 28, 2004, Mirant terminated the agreement with 1st Rochdale.

111.    Upon information and belief, as a result of this termination, 1st Rochdale did not have the necessary financial wherewithal to provide letters of credit or a third party guarantee to NYISO in order to purchase power for resale.    Accordingly, 1st Rochdale had to cease conducting business as an ESCO.

112.    Upon information and belief, after 1st Rochdale closed its business as an ESCO it transferred all its customers to ConEd.

113.    Upon information and belief, it appears that in 2004 1st Rochdale did not try to market its business to other ESCOs, as it did in 2001, when, with the approval of 1st Rochdale, ConEd contacted other ESCOs and asked them if they were interested in buying the retail sale of power business of 1st Rochdale and, within 24 hours, 1st Rochdale was contacted by 6 or 7 ESCOs.

114.    Upon information and belief, and based on the financial records of the Debtor, during the period 1st Rochdale was an ESCO (approximately 5 years), 1st Rochdale did not generate enough cash flow to meet its expenses (except in the year 2002-2003) even though, contrary to the reason for its existence, it charged its customers the same or higher rates charged by ConEd or other ESCOs.

C0460380189460/1376610.4

**Breaches of Fiduciary Duty Led to 1st Rochdale's Substantial Losses and Bankruptcy**

115.    Upon information and belief, during the period January 1999 through the date of filing of the bankruptcy petition, 1st Rochdale suffered losses in excess of $15 million, exclusive of the additional losses suffered by its wholly owned subsidiaries.

116.    Even though the BOD minutes indicate that Management knew about these losses, it appears that Management never devised any strategy to reduce the losses or to stop operating the businesses that were losing money.

117.    Upon information and belief, commencing in or about the beginning of 1999, Management embarked on an excessively costly and speculative venture to a build a power plant, which venture ultimately failed.

118.    Upon information and belief, after early 2000, when NCSC withdrew its financial support to 1st Rochdale and without 1st Rochdale having the financial ability to build a power plant, Management caused 1st Rochdale to spend millions of dollars on legal and professional fees for the proposed power plant project and diverted the limited resources of 1st Rochdale towards the power plant project.

119.    Upon information and belief, during the year 2003 and 2004 Thurgood and Wortham, with the approval of the BOD, in what amounted to a futile effort, carelessly spent thousands of dollars in travel, professional and other expenses lobbying Washington and Albany in order to obtain proper qualification for Liberty Bonds funding (as proposed funds were for the development of downtown Manhattan not the Bronx).

120.    Upon information and belief, Management's aforesaid diversion of the financial resources of 1st Rochdale towards the speculative power plant project, left 1st Rochdale without adequate financial resources, and caused 1st Rochdale and its subsidiaries to incur multi-million dollar losses, which in turn ultimately cause 1st Rochdale's bankruptcy filing.

(19)

**Bonus Payments to Thurgood, Wortham and Johnson**

121.    Upon information and belief, while 1st Rochdale was suffering significant losses, Thurgood, Wortham and Johnson were awarded incentive payments and bonus amounts by the BOD in addition to receiving their regular salary and other benefits.

122.    Upon information and belief, the award of incentive payments and bonus amounts occurred at a time during which 1st Rochdale was insolvent.

      i.    **Thurgood Incentive/Bonus Payments**

123.    Upon information and belief, during the period commencing April 1, 1999 through March 31, 2000 Thurgood was awarded incentives and bonuses in the amount of twenty-five thousand dollars ($25,000).

124.    Upon information and belief, during the period commencing April 1, 2000 through March 31, 2001, Thurgood was awarded incentives and bonuses in the amount of one hundred twenty-five thousand dollars ($125,000).

125.    Upon information and belief, during the period commencing April 1, 2002 through March 31, 2003, Thurgood was awarded incentives and bonuses in the amount of sixty two thousand four hundred fifty nine dollars ($62,459).

126.    Upon information and belief, during the period commencing April 1, 2003 through March 31, 2004, Thurgood was awarded incentives and bonuses in the amount of forty eight thousand nine hundred eight three dollars ($48,983).

127.    Hereinafter the bonus/incentive amounts received by Thurgood shall be referred to as the "Thurgood Incentive/Bonus Transfers."

128.    Upon information and belief, despite the fact that 1st Rochdale from its inception, suffered losses and the BOD was aware of those losses, the BOD still awarded the Thurgood Incentive/Bonus Transfers.

ii.   **The Wortham Incentive/Bonus Payments**

129.   Upon information and belief, during the period commencing April 1, 1999 through March 31, 2000, Wortham was awarded incentives and bonuses in the amount of five thousand dollars ($5,000).

130.   Upon information and belief, during the period commencing April 1, 2000 through March 31, 2001, Wortham was awarded incentives and bonuses in the amount of one hundred twenty-five thousand dollars ($125,000).

131.   Upon information and belief, during the period commencing April 1, 2002 through March 31, 2003, Wortham was awarded incentives and bonuses in the amount of thirty thousand twenty-five dollars ($30,025).

132.   Upon information and belief, during the period commencing April 1, 2003 through March 31, 2004, Wortham was awarded incentives and bonuses in the amount of forty four thousand five hundred thirty dollars ($44,530).

133.   Hereinafter the bonus/incentive amounts received by Wortham shall be referred to as the "Wortham Incentive/Bonus Transfers."

134.   Upon information and belief, despite the fact that 1st Rochdale from its inception, suffered losses and the BOD was aware of those losses, the BOD still awarded the Wortham Incentive/Bonus Transfers.

iii.   **The Johnson Incentive/Bonus Payments**

135.   Upon information and belief, during the period commencing April 1, 2000 through March 31, 2001, Johnson was awarded incentives and bonuses in the amount of one thousand dollars ($1,000).

(21)

136.    Upon information and belief, during the period commencing April 1, 2002 through March 31, 2003, Johnson was awarded incentives and bonuses in the amount of two thousand five hundred thirty three dollars ($2,533).

137.    Upon information and belief, during the period commencing April 1, 2003 through March 31, 2004, Johnson was awarded incentives and bonuses in the amount of twelve thousand eight hundred twenty five dollars ($12,825).

138.    Hereinafter the bonus/incentive amounts received by Johnson shall be referred to as the "Johnson Incentive/Bonus Transfers."

139.    Upon information and belief, despite the fact that 1st Rochdale from its inception, suffered losses and the BOD was aware of those losses, the BOD still awarded the Johnson Incentive/Bonus Transfers.

## COUNT ONE

### CLAIM FOR BREACH OF FIDUCIARY DUTIES OF DUE CARE AGAINST ALTMAN, BROWN, THE CRETHAN ESTATE, MILDWORM, RASKIN, SMITH, THE THURGOOD ESTATE, YAKER, WORTHAM AND JOHNSON

140.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

141.    Upon information and belief, as directors, senior officers, and/or employees with management responsibility at 1st Rochdale, Management owed 1st Rochdale fiduciary duties, when acting on behalf of 1st Rochdale, to exercise the care, diligence and skill that a reasonably prudent person in a like position would exercise under comparable circumstances, and with a view to 1st Rochdale's best interests.

142.    Upon information and belief, by virtue of the acts and omissions described in this Complaint, the Management failed to exercise the care, diligence, and skill that directors and

officers of a company would exercise under comparable circumstances, and instead acted in a grossly negligent manner, thereby violating their fiduciary duties to 1st Rochdale, in that, among other things:

(a)    Management operated 1st Rochdale's businesses in a manner that was neither financially nor economically viable. As set forth above, during the time that 1st Rochdale operated it suffered over $15,000,000 in losses. Rather than utilize the full $11.6 million remaining from the $14 million loan from NCSC to TPF LLC, of which $2.6 million had already been utilized for the purchase of the Zerega Avenue Property, Management chose to divert approximately $3 million from TPF LLC to 1st Rochdale and GPD for the development of a power plant. This diversion of funds from TPF LLC severely hurt TPF LLC's fuel oil distribution business and left TPF LLC short of the necessary funds to buy fuel oil at the cheapest price available.

(b)    Despite their fiduciary duties to 1st Rochdale, Management continued to waste the resources of 1st Rochdale and erode the Debtor's financial wherewithal to operate as a company. With respect to the plan to develop a power plant, Management spent millions of dollars in legal fees and consultants fees in order to obtain necessary permits and licenses, notwithstanding the cessation of financing from NCSC in 2000. Moreover, 1st Rochdale, lacking funds necessary to go through with the Zerega Avenue Property power plant construction as no agreement was in place, placed a $9.4 million bid to buy the North First Street, Brooklyn property from ConEd. Additionally, 1st Rochdale improperly incurred significant sums in a failed attempt to lobby politicians in Washington, DC, to insure that the power plant planned by 1st Rochdale, would qualify for the financing under the Liberty Zone Bonds proposed by the federal government pursuant to the New York City economic recovery incentives for the downtown Manhattan (Liberty Zone) area, despite the fact, that the Zerega Avenue Property was located in the Bronx. Despite the fact, that 1st Rochdale had no viable source of funding and despite the fact that it would cost close to $100,000,000 to build the power plant, 1st Rochdale with the approval of Management continued to pour money into the development of the power plant project. All of this occurred while according to the Debtor's books and records, 1st Rochdale was grossly undercapitalized for the business in which it was engaged.

(c)    Management continued to allow 1st Rochdale to engage in the sustainable energy business, despite the fact that it too was losing money. Although 1st Rochdale received a fee for the coordination of the sustainable energy activities, that fee was never sufficient to cover its operating expenses with respect to this business.

(d)    Even after 1st Rochdale's agreement with Mirant terminated and as a result of this termination, 1st Rochdale did not have the necessary financial wherewithal to provide letters of credit or a third party guarantee to NYISO in order to purchase power for resale and as a result had to close conducting business as an ESCO, Management allowed 1st Rochdale to transfer all of it accounts to ConEd and then made no attempt to market its business to other ESCOs, as it had done in 2001.

C0460380189460/1376610.4

143.    Upon information and belief, as a direct and proximate result of Management's actions and omissions, the Debtor has been substantially injured, and suffered damages in an amount to be determined at trial.

144.    By virtue of the foregoing, the Trustee is entitled to a judgment on behalf of the Debtor's estate jointly and severally against the Defendants in an amount to be determined at trial.

## COUNT TWO

### BREACH OF FIDUCIARY DUTIES AGAINST ALTMAN, BROWN, THE CRETHAN ESTATE, MILDWORM, RASKIN, SMITH, THE THURGOOD ESTATE AND YAKER, REGARDING BONUSES PAID TO THURGOOD, WORTHAM AND JOHNSON

145.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

146.    Upon information and belief, during the pre-petition period starting from in or about April 1, 1999 through March 31, 2004, 1st Rochdale was insolvent and faced a liquidity crisis which eventually led 1st Rochdale into bankruptcy.

147.    Upon information and belief, despite that liquidity crisis, the BOD caused 1st Rochdale to make incentive payments and bonus amounts to Thurgood, Wortham and Johnson during the pre-petition period as follows:

| Date | Name | Title | Amount |
|------|------|-------|--------|
| 4/01/1999- 3/31/2004 | Allen Thurgood | Chief Executive Officer | $261,442 |
| 4/01/1999- 3/31/2004 | Gregory Wortham | Chief Operating Officer | $204,555 |
| 4/01/1999- 3/31/2004 | David L. Johnson | Chief Financial Officer | $16,358 |

148.    Upon information and belief, given the Debtors' insolvent condition at the time, members of the BOD namely, Altman, Brown, Crethan, Mildworm, Raskin, Smith, Thurgood

C0460380189460/1376610.4

and Yaker breached their fiduciary duties in connection with compensation decisions during the pre-petition period, by paying the aforesaid incentive payments and bonus amounts to Thurgood, Wortham and Johnson.

149.    Upon information and belief, as a direct and proximate result of those breaches of fiduciary duties by the BOD, 1st Rochdale has been substantially injured and has suffered damages in the aggregate amount of $482,355.

150.    By virtue of the foregoing, the Trustee is entitled to a judgment on behalf of the Debtor's estate jointly and severally against the Defendants Gary Altman, Rhoda Brown, "John Doe 1" as Executor or Administrator of the Estate of George Crethan, Saul Mildworm, Jack Raskin, David Smith, "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood and Edward Yaker in the amount of $482,355 together with interest thereon.

## COUNT THREE

### AVOIDANCE AND RECOVERY OF THE
### THURGOOD INCENTIVE/BONUS TRANSFERS AS FRAUDULENT CONVEYANCES
### PURSUANT TO 11 U.S.C. §§ 544(b) AND 550(a) AND §§ 273, 274, 275 AND 278 OF
### NEW YORK DEBTOR AND CREDITOR LAW
### (as against "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood)

151.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

152.    Upon information and belief, the Thurgood Incentive/Bonus Transfers from or on behalf of the Debtor to the Thurgood were made without fair consideration. Upon information and belief, the Thurgood Incentive/Bonus Transfers were not made by or on behalf of the Debtor to Thurgood in good faith or honestly, fairly, and openly.

153.    Upon information and belief, on the date of each of the Thurgood Incentive/Bonus Transfers, the Debtor (i) was insolvent or was rendered insolvent as a result of such transfer, (ii) had unreasonably small capital for the business in which it was engaged or was

(25)

about to engage, and/or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

154.    Accordingly, pursuant to 11 U.S.C. § 544(b) and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law, the Trustee may avoid the Thurgood Incentive/Bonus Transfers.

155.    Accordingly, pursuant to 11 U.S.C. § 550(a), the Trustee may recover from Defendant "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood the value of the Thurgood Incentive/Bonus Transfers, in the amount of $261,442, plus interest, for the benefit of the Debtor's estate.

## COUNT FOUR

### UNJUST ENRICHMENT
### FROM THE THURGOOD INCENTIVE/BONUS TRANSFERS
### (as against "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood)

156.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

157.    Upon information and belief, as a result of the Thurgood Incentive/Bonus Transfers from or on behalf of the Debtor to Thurgood, Thurgood received interests in property that rightfully belonged to the Debtor.

158.    Upon information and belief, the Debtor did not receive any benefit or received less than reasonably equivalent value in connection with the Thurgood Incentive/Bonus Transfers.

159.    Upon information and belief, Thurgood was unfairly benefited by wrongfully receiving and retaining the benefits of the Thurgood Incentive/Bonus Transfers without providing adequate consideration therefor to the Debtor, and was unjustly enriched thereby.

C0460380189460/1376610.4

160.    By reason of the foregoing unjust enrichment, the Trustee is entitled to judgment against Defendant "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood in the amount of $261,442, together with interest thereon.

## COUNT FIVE

### AVOIDANCE AND RECOVERY OF THE
### WORTHAM INCENTIVE/BONUS TRANSFERS AS FRAUDULENT CONVEYANCES
### PURSUANT TO 11 U.S.C. §§ 544(b) AND 550(a) AND §§ 273, 274, 275 AND 278 OF
### NEW YORK DEBTOR AND CREDITOR LAW
### (as against Defendant Gregory Wortham)

161.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

162.    Upon information and belief, the Wortham Incentive/Bonus Transfers from or on behalf of the Debtor to Wortham were made without fair consideration. Upon information and belief, the Wortham Incentive/Bonus Transfers were not made by or on behalf of the Debtor to Wortham in good faith or honestly, fairly, and openly.

163.    Upon information and belief, on the date of each of the Wortham Incentive/Bonus Transfers, the Debtor (i) was insolvent or was rendered insolvent as a result of such transfer, (ii) had unreasonably small capital for the business in which it was engaged or was about to engage, and/or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

164.    Accordingly, pursuant to 11 U.S.C. § 544(b) and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law, the Trustee may avoid the Wortham Incentive/Bonus Transfers.

165.    Accordingly, pursuant to 11 U.S.C. § 550(a), the Trustee may recover from Defendant Gregory Wortham the value of the Wortham Incentive/Bonus Transfers, in the amount of $204,555, plus interest, for the benefit of the Debtor's estate.

(27)

## COUNT SIX

### UNJUST ENRICHMENT
### FROM THE WORTHAM INCENTIVE/BONUS TRANSFERS
### (as against Defendant Gregory Wortham)

166.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

167.    Upon information and belief, as a result of the Wortham Incentive/Bonus Transfers from or on behalf of the Debtor to Wortham, Wortham received interests in property that rightfully belonged to the Debtor.

168.    Upon information and belief, the Debtor did not receive any benefit or received less than reasonably equivalent value in connection with the Wortham Incentive/Bonus Transfers.

169.    Upon information and belief, Wortham was unfairly benefited by wrongfully receiving and retaining the benefits of the Wortham Incentive/Bonus Transfers without providing adequate consideration therefor to the Debtor, and was unjustly enriched thereby.

170.    By reason of the foregoing unjust enrichment, the Trustee is entitled to judgment against Defendant Gregory Wortham in the amount of $204,555, together with interest thereon.

## COUNT SEVEN

### AVOIDANCE AND RECOVERY OF THE
### JOHNSON INCENTIVE/BONUS TRANSFERS AS FRAUDULENT CONVEYANCES
### PURSUANT TO 11 U.S.C. §§ 544(b) AND 550(a) AND §§ 273, 274, 275 AND 278 OF
### NEW YORK DEBTOR AND CREDITOR LAW
### (as against Defendant David Johnson)

171.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

(28)

172.    Upon information and belief, the Johnson Incentive/Bonus Transfers from or on behalf of the Debtor to Johnson were made without fair consideration.  Upon information and belief, the Johnson Incentive/Bonus Transfers were not made by or on behalf of the Debtor to Wortham in good faith or honestly, fairly, and openly.

173.    Upon information and belief, on the date of each of the Johnson Incentive/Bonus Transfers, the Debtor (i) was insolvent or was rendered insolvent as a result of such transfer, (ii) had unreasonably small capital for the business in which it was engaged or was about to engage, and/or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

174.    Accordingly, pursuant to 11 U.S.C. § 544(b) and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law, the Trustee may avoid the Johnson Incentive/Bonus Transfers.

175.    Accordingly, pursuant to 11 U.S.C. § 550(a), the Trustee may recover from Defendant David Johnson the value of the Johnson Incentive/Bonus Transfers, in the amount of $16,358, plus interest, for the benefit of the Debtor's estate.

## COUNT EIGHT

### UNJUST ENRICHMENT
### FROM THE JOHNSON INCENTIVE/BONUS TRANSFERS
### (as against Defendant David Johnson)

176.    The Trustee realleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

177.    Upon information and belief, as a result of the Johnson Incentive/Bonus Transfers from or on behalf of the Debtor to Johnson, Johnson received interests in property that rightfully belonged to the Debtor.

C0460380189460/1376610.4

178. Upon information and belief, the Debtor did not receive any benefit or received less than reasonably equivalent value in connection with the Johnson Incentive/Bonus Transfers.

179. Upon information and belief, Johnson was unfairly benefited by wrongfully receiving and retaining the benefits of the Johnson Incentive/Bonus Transfers without providing adequate consideration therefor to the Debtor, and was unjustly enriched thereby.

180. By reason of the foregoing unjust enrichment, the Trustee is entitled to judgment against Defendant David Johnson in the amount of $16,358, together with interest thereon.

**WHEREFORE**, the Trustee as Plaintiff respectfully requests that this Court grant judgment for the Trustee on behalf of the Debtors' estates as follows:

1. On Count One, a determination that Defendants Gary Altman, Rhoda Brown, "John Doe 1" as Executor or Administrator of the Estate of George Crethan, Saul Mildworm, Jack Raskin, David Smith, "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood, Edward Yaker, Gregory Wortham and David Johnson breached their fiduciary duties to 1st Rochdale, and a judgment jointly and severally against those Defendants Gary Altman, Rhoda Brown, "John Doe 1" as Executor or Administrator of the Estate of George Crethan, Saul Mildworm, Jack Raskin, David Smith, "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood, Edward Yaker, Gregory Wortham and David Johnson in an amount to be determined at trial.

2. On Count Two, a determination that Defendants Gary Altman, Rhoda Brown, "John Doe 1" as Executor or Administrator of the Estate of George Crethan, Saul Mildworm, Jack Raskin, David Smith, "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood and Edward Yaker breached their fiduciary duties to 1st Rochdale in connection with the awarding of incentive payments and bonus amounts to Thurgood, Wortham and Johnson, and a judgment jointly and severally against Defendants Gary Altman, Rhoda Brown, "John Doe 1"

(30)

as Executor or Administrator of the Estate of George Crethan, Saul Mildworm, Jack Raskin, David Smith, "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood and Edward Yaker in the amount of $482,355, plus applicable interest thereon.

3.      On Count Three, a determination that the Thurgood Incentive/Bonus Transfers constitute fraudulent conveyances and are subject to avoidance under 11 U.S.C. § 544(b) and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law, and recovery in the amount of $261,442, plus interest, from Defendant "John Doe 2" as Executor or Administrator of the Estate of Allen Thurgood, pursuant to 11 U.S.C. § 550(a);

4.      On Count Four, judgment against Defendant "John Doe 2" as Executor and Administrator of the Estate of Allen Thurgood in the amount of $261,442, together with interest thereon;

5.      On Count Five, a determination that the Wortham Incentive/Bonus Transfers constitute fraudulent conveyances and are subject to avoidance under 11 U.S.C. § 544(b) and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law, and recovery in the amount of $204,555, plus interest, from Defendant Gregory Wortham, pursuant to 11 U.S.C. § 550(a);

6.      On Count Six, judgment against Defendant Gregory Wortham in the amount of $204,555, plus interest thereon;

7.      On Count Seven, a determination that the Johnson Incentive/Bonus Transfers constitute fraudulent conveyances and are subject to avoidance under 11 U.S.C. § 544(b) and §§ 273, 274, 275 and 278 of the New York Debtor and Creditor Law, and recovery in the amount of $16,358, plus interest, from Defendant David Johnson, pursuant to 11 U.S.C. § 550(a);

C0460380189460/1376610.4

8.    On Count Eight, judgment against Defendant David Johnson in the amount of

$16,358, plus interest thereon; and

9.    For such other and further relief as the Court may deem just and proper.


Dated:    New York, New York
          March 28, 2007

                        BRYAN CAVE LLP

                        Counsel to the Chapter 7 Trustee


                        By: /s/ Robert A. Wolf
                            Robert A. Wolf (RW-3419)
                            Andrea K. Fisher (AF 0150)
                        1290 Avenue of the Americas
                        New York, New York  10104
                        Telephone:  (212) 541-2000
                        Facsimile:  (212) 541-4630

(32)

# EXHIBIT
# B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

            In re        :

1ST ROCHDALE COOPERATIVE GROUP,  :
LTD.,
                     :

          Debtor.    :

- - - - - - - - - - - - - - - - - -x

ROBERT L. GELTZER, as Chapter 7  :
Trustee for 1ST ROCHDALE
COOPERATIVE GROUP, LTD.,      :

          Plaintiff,  :

     - against -     :

GARY ALTMAN et al.,       :

         Defendants.  :

- - - - - - - - - - - - - - - - - -x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 1/17/2008

**MEMORANDUM DECISION**

07 Civ. 7852 (DC)

Chapter 7
No. 05-12086 (PCB)

**APPEARANCES:**     BRYAN CAVE LLP
                Attorneys for Plaintiff
                   By: Robert A. Wolf, Esq.
                      Andrea K. Fisher, Esq.
                1290 Avenue of the Americas
                New York, NY 10104

                SCHWARTZ, LICHTENBERG LLP
                Attorneys for Moving Defendants
                   By: Barry E. Lichtenberg, Esq.
                420 Lexington Avenue
                New York, NY 10170

**CHIN, D.J.**

      In this adversary proceeding, plaintiff Robert L.

Geltzer, as Chapter 7 Trustee (the "Trustee") of debtor 1st

Rochdale Cooperative Group, Ltd. ("Rochdale"), sues ten former

officers or directors of Rochdale (or their estates), seeking

damages for alleged breaches of fiduciary duty and fraudulent

transfers.

Relying principally on the business judgment rule, defendants Gary Altman, Rhoda Brown, the Estate of George Crethan, Saul Mildworm, Jack Raskin, David Smith, and Edward Yaker (collectively, "Movants") move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, the motion is denied in part and granted in part.

Movants are named as defendants only in Counts One and Two of the eight-count complaint.  Count One alleges that all ten former officers and directors breached their fiduciary duties to Rochdale by operating Rochdale in a manner that was not financially viable, wasting resources, pursuing risky projects that were unlikely to succeed, and taking on debt that it could not repay.  Count Two alleges that the eight former directors breached their fiduciary duties to Rochdale by authorizing unwarranted and excessive incentive payments and bonuses to three officers, Allen Thurgood (now deceased, who was also a director), Gregory Wortham, and David L. Johnson.  Thurgood's estate, Wortham, and Johnson are also named as defendants herein.

Under New York law, the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."  Auerbach v. Bennett, 419 N.Y.S.2d 920, 926 (1979); accord Owen v. Hamilton, 843 N.Y.S.2d 298, 302 (1st Dep't 2007).  The business judgment rule will not, however, protect a decision that is "the product

- 2 -

of fraud, self-dealing or bad faith." Patrick v. Allen, 355 F.
Supp. 2d 704, 710 (S.D.N.Y. 2005). At the same time, to earn the
protection of the business judgment rule, directors must do more
than merely avoid fraud, bad faith, and self-dealing. Hanson
Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264, 274 (2d Cir.
1986). The business judgment rule protects directors who act
with "due care" and "conscientious fairness." Id. (quoting
Alpert v. 28 Williams St. Corp., 483 N.Y.S.2d 667, 674 (1984);
see also Croton River Club, Inc. v. Half Moon Bay Homeowners
Ass'n (In re Croton River Club, Inc.), 52 F.3d 41, 44 (2d Cir.
1995) (business judgment rule applies where directors take
actions "in good faith and after a reasonable investigation").
In other words, a director who exercises reasonable diligence in
gathering and considering material information, who makes an
informed decision after a reasonable investigation, will be
protected from liability, even if the decision turns out to be
"unwise or inexpedient." Levandusky v. One Fifth Ave. Apt.
Corp., 554 N.Y.S.2d 807, 811 (1990) (quoting Pollitz v. Wabash
R.R. Co., 207 N.Y. 113, 124 (1912)).[1]

　　　　Here, the complaint does not allege fraud, bad faith,
or self-dealing on the part of the seven former directors in
question. Nor does it allege that these directors acted in an

---

[1]　　See also RSL Commc'ns PLC ex rel. Jervis v. Bildirici,
No. 04 Civ. 5217 (KMK), 2006 WL 2689869, at *6 (S.D.N.Y. Sept.
14, 2006) ("[T]o receive the protection of the business judgment
rule a director must show an exercise of judgment, not simply the
existence of a business decision. Directors' fiduciary duties
'require them to do more "than passively rubber-stamp the
decisions of the active managers."'").

ultra vires manner or in furtherance of any illegitimate
purposes.  Count One of the complaint does allege, however, in
words or substance, that all ten former officers and directors
failed to act with due care and conscientious fairness.  Count
One of the complaint alleges, for example:

> Upon information and belief, by virtue of the
> acts and omissions described in this
> Complaint, the Management [defined to include
> all ten former officers and directors] failed
> to exercise the care, diligence, and skill
> that directors and officers of a company
> would exercise under comparable
> circumstances, and instead acted in a grossly
> negligent manner, thereby violating their
> fiduciary duties to [Rochdale] . . . .

(Compl. ¶ 142).  In essence, Count One of the complaint alleges
that the officers and directors of Rochdale ignored or failed to
consider material information, failed to exercise due care and
reasonable diligence, failed to conduct a reasonable
investigation, and made decisions that were not reasonably
informed.  (Compl. ¶¶ 115-20, 141-44).

These allegations are sufficient at this early stage of
the litigation.  On a motion to dismiss, of course, I am required
to accept the factual allegations of the complaint as true, and I
must draw all reasonable inferences in favor of the non-moving
party.  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see
Erickson v. Pardus, 127 S. Ct. 2197, 2199 (2007) (per curiam).  A
motion to dismiss must be denied if the complaint alleges "enough
facts to state a claim for relief that is plausible on its face."
Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007 (quoting Bell
Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).  The

- 4 -

question is not whether I believe the allegations of the
complaint or whether I think the Trustee is likely to be able to
prove the facts alleged in the complaint, for "a well-pleaded
complaint may proceed even if it strikes a savvy judge that
actual proof of those facts is improbable, and 'that a recovery
is very remote and unlikely.'" Bell Atlantic, 127 S. Ct. at 1965
(quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  The
Trustee has alleged enough facts in Count One to render plausible
its argument that the Movants are not entitled to the protection
of the business judgment rule with respect to their decisions
that resulted in millions of dollars of alleged losses.

     Count Two, however, is inadequately pled.  Count Two
does not allege a failure by the former directors to exercise due
care or reasonable diligence.  Count Two merely alleges that the
three former officers were paid incentives and bonuses when
Rochdale was insolvent, while Rochdale was suffering losses.
(See Compl. ¶¶ 121-39, 145-50).  One of the officers, Johnson, is
alleged to have received only $16,358 in incentives and bonuses
over a five-year period.  (Id. ¶ 147).  This amount is so low it
evidences nothing.  The amounts for Thurgood ($261,442) and
Wortham ($204,555), while higher, are hardly a basis for concern,
as they were paid over a five-year period as well.  (Id.).

     In the absence of any allegation of fraud, bad faith,
self-dealing, lack of due care, or lack of reasonable diligence
by the seven former directors in question, the Trustee's argument
that they are not protected by the business judgment rule is not

- 5 -

plausible and therefore fails as a matter of law.  Count Two is dismissed.

Movants make certain additional arguments, which I consider only with respect to Count One.  Movants argue that certain claims are barred by the three-year statute of limitations.  As I have previously held, however, a six-year statute of limitations applies to claims on behalf of a corporation against its officers and directors for breach of fiduciary duty.  <u>Lippe v. Bairnco Corp.</u>, 230 B.R. 906, 913-14 (S.D.N.Y. 1999); <u>accord</u> <u>Pereira v. Centel Corp. (In re Argo Commc'ns Corp.)</u>, 134 B.R. 776, 785-88 (Bankr. S.D.N.Y. 1991) (holding six-year statute of limitations applies to bankruptcy trustee's suit, in name of debtor and for benefit of creditors, against related corporations for breach of fiduciary duty and corporate waste).  The six-year statute applies here, and thus Movants' statute of limitations defense is rejected.

Movants also contend that the complaint fails to adequately plead a breach of fiduciary duty claim against the former directors because it does not allege the dates each director served or which of them, if any, participated in any vote or board meeting.  This contention is rejected.  The complaint alleges that five of the former directors were elected to the board when Rochdale was incorporated in 1997 and the other three were elected to the board on June 6, 1998.  (Compl. ¶¶ 29-31).  The complaint alleges, in essence, that all the former directors participated in all the board's decisions during the

- 6 -

relevant time period. (<u>See</u> <u>id.</u> ¶¶ 75, 116-20). These
allegations are sufficient, for now.

Movants additionally argue that the complaint
controverts its own allegation that the officers and directors of
Rochdale ignored or failed to consider material information by
asserting -- at the same time -- that the officers and directors
spent "millions of dollars on legal and professional fees" in
pursuing the power plant projects. (Compl. ¶ 118). The fact
that the board hired lawyers and experts does provide some
evidence that the directors acted diligently, but these
circumstances could also show, as the Trustee alleges, that the
directors spent too much money on legal and professional fees.
At the pleading stage, I must draw all reasonable inferences in
favor of the non-moving party. The Trustee's allegations, though
seemingly contradictory, are nevertheless plausible, and the
directors' reliance on lawyers and experts, by itself, does not
preclude a finding that they acted without due care and
diligence. Accordingly, Movants' argument in this respect is
rejected, for now.

Finally, Movants argue that the Trustee's claims are
barred because he failed to provide prior notice of this
adversary proceeding and an opportunity for interested parties to
be heard. The argument is rejected, for the reasons set forth at
pages 28-32 of the Trustee's memorandum of law in opposition to
the motion to dismiss.

- 7 -

## CONCLUSION

For the reasons set forth above, Movants' motion is denied as to Count One and granted as to Count Two.  Count Two is dismissed.

SO ORDERED.

Dated:  New York, New York
January 17, 2008

_____
DENNY CHIN
United States District Judge

- 8 -

# EXHIBIT
# C

**Pressment, Jonathan**

| | |
|---|---|
| **From:** | Fisher, Andrea K. [AKFisher@bryancave.com] |
| **Sent:** | Thursday, March 06, 2008 11:16 AM |
| **To:** | Pressment, Jonathan |
| **Cc:** | Rubinstein, Ken |
| **Subject:** | RE: 1st Rochdale |

Jonathan:

Thank you for you response with respect to the IRAs. We are working with the Trustee with respect to the settlement figure. I will get a letter to you confirming that we will not be pursuing the breach of fiduciary duty claim with respect to the bonus payments.

All the best.

Andrea